UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

SHONA GOODRIDGE,                )
                                )
            Plaintiff,          )
                                )
        vs.                     )
                                )       Case No. 4:11CV210 CDP
MICHAEL J. ASTRUE,              )
                                )
            Defendant.          )
                                )

## MEMORANDUM AND ORDER

This is an action for judicial review of the Commissioner's decision denying

Shona Goodridge's application for benefits under the Social Security Act.

Goodridge seeks disability insurance benefits (DIB) under Title II of the Act, 42

U.S.C. §§ 405(g), et seq. Section 205(g) of the Act, 42 U.S.C. §§ 405(g), provides

for judicial review of a final decision of the Commissioner under Title II.

Goodridge claims she is disabled because of fibromyalgia, lumbar spine

degenerative disk disease, migraine headaches, epilepsy, insomnia, depression and

anxiety. Because the ALJ failed to give appropriate weight to opinions of

Goodridge's treating physicians when he assessed her residual function capacity,

the decision denying benefits was not supported by substantial evidence. I will

reverse the decision of the Commissioner and remand for further consideration.

## **PROCEDURAL HISTORY**

On November 7, 2008, Goodridge filed a Title II application for a period of disability and stated that she became disabled beginning December 18, 2003. After her application was denied she filed a timely request for hearing. Goodridge appeared with counsel for the hearing on March 17, 2010. At the hearing, Goodridge amended the onset date to November 21, 2007, which was the date after a previous denial of benefits, thus making the period of claimed disability from November 21, 2007 through the last insured date of December 31, 2008. On April 22, 2010, the ALJ issued a decision finding that Goodridge was not disabled during the insured period. Goodridge requested review of the ALJ's decision by the Appeals Council, and the Appeals Council affirmed the ALJ on December 2, 2010. Therefore, the decision fo the ALJ stands as the final decision of the Commissioner.

## **EVIDENCE BEFORE THE ADMINISTRATIVE LAW JUDGE**

### Medical Records

On March 1, 2006, Goodridge was diagnosed with dysthimic disorder and obsessive compulsive disorder and was assessed a GAF score of 60 by Dr. Fox at

the Center for Psychiatric Services.[1]

On June 19, 2006, Goodridge met with Dr. Choudhary, a neurologist, due to bouts of memory lapse. Dr. Choudhary started Goodridge on Tripleptal and ordered an EEG. The EEG was conducted on June 28, 2006, where Dr. Choudhary found the EEG to be abnormal and subsequently diagnosed Goodridge with complex partial seizures and proscribed Neurontin.

On November 29, 2006, Dr. Myers, Goodridge's primary care physician, completed a Physical Residual Functional Capacity Assessment and assessed Goodridge to be physically "totally disabled." Furthermore, he found her pain to be severe and that she could only sit, stand, walk, and work for one hour per day. Also, he found that she can occasionally lift or carry 10 pounds, but should never lift or carry over 10 pounds. He found that she should not be exposed to unprotected heights, can continuously be around moving machinery, can frequently be exposed to marked temperature changes, should not be exposed to dust, fumes, and gases, and can occasionally drive automotive equipment and be exposed to

---

[1]The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness" which does "not include impairment in functioning due to physical (or environmental) limitations." Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994). A GAF score of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflict with peers or co-workers)." DSM-IV at 32.

noise.  He further found that she can occasionally bend, squat, crawl, crouch, and kneel; and that she can frequently reach above and stoop; and she should not climb. When noting whether the patient has a determinable physical impairment expected to produce pain, Dr. Myers wrote "DDD LS spine," or degenerative disc disease of the lumbar spine.

On August 2, 2007, at the request of and after a visit to Dr. Myers regarding loss of control of bowel movements and back pain, Goodridge met with Dr. Mohsen, a neurologist.  Dr. Mohsen listed his impressions of Goodridge as having common migraine headaches, complex partial seizures, and small fiber polyneuropathy.  Dr. Mohsen further requested that she partake in an EMG/nerve conduction study for polyneuropathy.  Dr. Mohsen also noted that Goodridge's previous EEG in June 2006 was consistent with epilepsy.

On August 24, 2007, Goodridge underwent an EMG/nerve conduction study by Dr. Mohsen which revealed abnormalities "consistent with bilateral lower extremity sensory neuropathy."  A follow-up visit to Dr. Mohsen took place on September 12, 2007, where Dr. Mohsen noted right facial twitching, possibly seen with partial seizures.  Dr. Mohsen requested an EEG which took place on September 13, 2007.  The EEG was moderately abnormal due to "frequent left temporal epileptiform discharges."

On November 12, 2007, Goodridge underwent an MRI which found that an annular tear at L4-5 that had been visible on March 16, 2005, was no longer visible. Furthermore, the disc protrusion at L4-5 which was previously seen had also decreased since March 16, 2005. The MRI did show mild degenerative disc disease at the L4-5 disk level.

On January 31, 2008, Goodridge returned to Dr. Myers where she stated she had back pain and memory loss. Dr. Myers wrote that Goodridge "is using a tens unit - has it up as high as it goes - states only slight pain."

On March 24, 2008, Goodridge began treatment with a new primary care physician, Dr. Parks, and reported back pain and all over pain. Dr. Parks noted that Goodridge felt like she had the flu "all the time," and had aches "all the time." Due to sleep problems, a visit with Dr. Parks commenced on May 12, 2008, resulting in a diagnosis of B12 deficiency, and an injection was provided. On July 16, 2008, as well as September 15, 2008, Goodridge returned to Dr. Parks with issues of hip pain, back pain, and migraines.

On June 24, 2008, August 15, 2008, and November 2, 2008, Goodrige reported to the Phelps County Regional Medical Center emergency room. In June, Goodridge complained of back pain and anger and was discharged with a diagnosis of panic attack and anger. In August, Goodridge reported to the ER with a

headache and was given a shot of Toradol and Vistaril and was discharged.  In November, Goodridge reported to ER with back pain and was diagnosed with chronic low back pain and was given a prescription.

On January 6, 2009, Goodridge underwent an MRI of her back.  This MRI found a "small disk protrusion centrally at L2-3" with "disk bulging at L4-5 and L5-S1" and that a "[s]mall annular tear is present at the disk bulge at L4-5."

On January 16, 2009, Goodridge met with Dr. Ryan, a neurosurgeon, regarding her back pain.  Dr. Ryan noted some mild chronic disk bulge at L4-5 and L5-S1, with suggestion of a possible mild annular tear.  As a first line of action, Dr. Ryan said he would consider a pain referral and facet injections or epidural steroid injections.

On January 28, 2009, Dr. Parks wrote a narrative stating that he believes in Goodridge's pain, but is uncertain of the source of that pain.  He further opined that he believed her ability to work is affected by her physical condition.

On March 31, 2009, Goodridge met with Dr. Rice, a rheumatologist, who performed an examination and diagnosed Goodridge with arthralgias.  The long-standing pain and Goodridge's history was found to be consistent with fibromyalgia, but her response to prednisone[2] is a bit unusual, which increased Dr.

_____

[2]Goodridge was using prednisone for poison ivy.

Rice's suspicion of Goodridge having a connective tissue disorder.   Dr. Rice

further reported that Goodridge had pain in 11 or more pressure points, tension

headache, chronic fatigue and inability to ambulate effectively.

On April 13, 2009, Goodridge, who stopped her seizure medication of her

own volition, met with Dr. Mohsen regarding a twitching that was occurring in her

left upper extremity.  Dr. Mohsen diagnosed polyneuropathy which was likely due

to a combination of a B12 deficiency and a positive ANA, and was also

exacerbated by a Vitamin D deficiency.

## Agency Records

On February 12, 2009, a non-examining State Agency medical consultant

completed a Mental Residual Functional Capacity Assessment and Psychiatric

Review Technique Form in regard to Goodridge.  He stated that Goodridge's

reports of functional limitations are considered "partially credible." However, he

stated that her reports of functional limitations are not consistent with her

complaints to physicians regarding her mental impairments.  Overall, the medical

consultant states that Goodridge has mild to moderate functional limitations due to

depression and pain.  He further opined that she can understand, remember and

carry out simple to moderately complex instructions, she can make commensurate

work related decisions, and she can relate appropriately to others in the workplace

and adapt to changes in work routine.

On February 13, 2009, a non-examining single decision maker completed a Physical Residual Functional Capacity (RFC) and found that Goodridge could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk at least 2 hours in an 8-hour workday, and sit for a total of about 6 hours in an 8-hour workday. She further found that Goodridge could occasionally climb a ramp or stairs but never a ladder/rope or scaffolds. She also found that Goodridge could frequently balance and occasionally kneel, crouch, and crawl. The RFC further stated that Goodridge should avoid balancing in narrow, unprotected elevated environments due to her history of epilepsy.

## Testimony

Goodridge testified that she lives in a house with her husband and five children. She home schools the four younger children. She uses computer programs for home schooling. She last worked in December 2003. She operated a home day care in her home with a limit of 15 children including hers. She alleged disability due to back pain, fibromyalgia, degenerative disk disease, widespread body pain, migraines, confusion, and mental fog. She does not sleep well. She cannot walk far because she has pain up her leg into the spine. She drives to doctor appointments and to the grocery store. She always takes a child with her when she

goes to the store. She communicates with others about home schooling by internet or going to some groups. She has difficulty making the bed, doing a full load of dishes, and sweeping the floor due to back pain. She folds laundry about halfway and then has to quit. Her back sometimes gets stuck when bending to the ground to pick up something. She can lift a gallon of milk, but cannot do it repetitively.

She wears a TENS unit on a regular daily basis. She has a problem with incontinence that is more like leakage and she does not realize she has gone. The muscle pain in her back and legs is the worst. She has very little energy. She had trouble with her hands and arms from 2007 to 2008 when she could not hold a coffee cup. Her hand would be totally numb and she could not grasp. She has had trouble with migraines since she was a child. Since November 2007 she sometimes goes a month without a headache, sometimes she gets three to four a month. She testified that her back pain can trigger a migraine.

Goodridge testified that she has been treated for depression and stress. She sometimes wants to cut herself off from everybody. She sometimes has mental confusion where she has trouble verbalizing what she is thinking and remembering names. She testified she is able to concentrate on tasks from start to finish as long as no one is around to bother her.

The ALJ heard the testimony of a vocational expert. He asked the expert to

consider a person of Goodridge's age and experience who could: occasionally lift

or carry objects of 20 pounds, frequently lift or carry objections up to 10 pounds,

stand and or walk 6 hours and sit 6 hours in an 8 hour work day.  He added

occasional limitations on climbing, balancing, kneeling, crouching, crawling and

stooping.  The person could never use ladders, ropes, or scaffolds and could never

operate machinery or be exposed to heights.  Additionally, the person had mild

difficulties in social functioning, and moderate difficulties in concentration,

persistence, and pace, and experienced mild to moderate fatigue and discomfort

affecting her ability to work in a competitive environment.   The vocational expert

opined that such an individual could work as a companion or personal attendant,

packing line worker, fast food worker, and in small product assembly.  The expert

opined that there were substantial jobs existing in this region or nationally that

such a person could do.

On cross-examination, the expert agreed that if the individual had marked

limitations in the ability to make simple work related decisions and marked

limitations in the ability to work in proximity to others without being distracted,

then such a person could not be employed.  If the ALJ's hypothetical were changed

to say the person would not be able to complete a normal work day without

interruptions from psychologically based symptoms and was limited in the ability

to perform at a consistent pace without an unreasonable number of interruptions, the person could not work. Similarly, if the ALJ's hypothetical were changed to say that the person was limited to occasional handling at the sedentary level (with limitations of needing to change positions every 15 minutes and a 5 pound lifting restriction) then that person would not be able to work.

Goodridge's husband submitted a third party statement. He reported that his wife's back pain has gotten progressively worse to the point that she is unable to control her bowels some days. She spends some of her days totally bedfast. She does not get to do the fun things normal people do. He reported his wife is truly disabled. If she could hold a job full time or even part time she would in a minute.

Goodridge's daughter also submitted a third party statement. She reported her mother struggles just to get out of bed because of severe, near crippling back pain. There are times she is unable to leave her bed for days. Those days the daughter makes Goodridge's meals and helps prop her upright on her pillows so that she can eat. She accompanies her mother to her doctor appointments to assist her when needed. When she sits down she often needs someone to help her up and walk until she can correct herself and "almost waddle" to the next point. Her daughter reported that she is always home watching her little brothers and helping her mom get around the house or cooking. She said a few weeks ago they went

grocery shopping, but they could not finish shopping because her mother's back started to lock up to where she could not stand. She had to call her dad at work to come to the store and help her home. She reported her mother is truly totally disabled and it has a disabling effect on the entire family as well.

## EVIDENCE BEFORE THE APPEALS COUNCIL

The following additional evidence was presented to the Appeals Council. Dr. Parks, Goodridge's primary physician, submitted a physical and mental Medical Source Statement on March 10, 2010. The mental Medical Source Statement said that Goodridge is extremely limited in the ability to complete a normal workday, and markedly limited in the ability to work in the proximity of others without being distracted by them. She is also limited in the ability to make simple work related decisions, the ability to travel to unfamiliar places or use public transportation, or the ability to set realistic goals and make plans independently of others.

Dr. Parks' Medical Source Statement states that Goodridge cannot lift five or more pounds frequently or occasionally; she cannot stand and/or walk for more than 15 minutes without a break; she cannot stand or walk for more than one hour throughout an eight hour workday; she cannot sit for longer than 15 minutes without a break; She can sit for only less than an hour throughout an eight hour

workday, and she is limited in her pushing/pulling.  Also, the Medical Source

Statement says that Goodridge should never climb, stoop, kneel, crouch, crawl, or

reach, and she should avoid all exposure to dust/fumes, vibration, and hazards.

Furthermore, Goodridge would need to lie down or recline for an hour and a half

once a day due to pain, and then this pain will cause issues with concentration.

## LEGAL STANDARD

A court's role on review is to determine whether the Commissioner's

findings are supported by substantial evidence on the record as a whole.  Gowell v.

Apfel, 242 F.3d 793, 796 (8th Cir. 2001).  Substantial evidence is less than a

preponderance, but is enough so that a reasonable mind would find it adequate to

support the ALJ's conclusion.  Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir.

2000).  As long as there is substantial evidence on the record as a whole to support

the Commissioner's decision, a court may not reverse it because substantial

evidence exists in the record that would have supported a contrary outcome, id., or

because the court would have decided the case differently.  Browning v. Sullivan,

958 F.2d 817, 822 (8th Cir. 1992).  In determining whether existing evidence is

substantial, a court considers "evidence that supports it."  Singh v. Apfel, 222 F.3d

448, 451 (8th Cir. 2000) (quoting Warburton v. Apfel, 188 F.3d 1047, 1050 (8th

Cir. 1999)).  Where the Commissioner's findings represent one of two inconsistent

conclusions that may reasonably be drawn from the evidence, however, those

findings are supported by substantial evidence.  Pearsall v. Massanari, 274 F.3d

1211, 1217 (8th Cir. 2001) (internal citation omitted).

To determine whether the decision is supported by substantial evidence, the

Court is required to review the administrative record as a whole and to consider:

(1) the credibility findings made by the Administrative Law Judge;

(2) the education, background, work history, and age of the claimant;

(3) the medical evidence from treating and consulting physicians;

(4) the plaintiff's subjective complaints relating to exertional and non-exertional impairments;

(5) any corroboration by third parties of the plaintiff's impairments; and

(6) the testimony of vocational experts, when required, which is based upon a proper hypothetical question.

Brand v. Secretary of Dep't of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th

Cir. 1980).

Disability is defined in social security regulations as the inability to engage

in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than twelve

months.  42 U.S.C. § 416(i)(1);  42 U.S.C. § 1382c(a)(3)(A);  20 C.F.R. §

404.1505(a); 20 C.F.R.§ 416.905(a). In determining whether a claimant is disabled the Commissioner must evaluate the claim using a five step procedure.

First, the Commissioner must decide if the claimant is engaging in substantial gainful activity. If so, then the claimant is not disabled. 20 C.F.R. § 404.1520(b).

Next, the Commissioner determines if the claimant has a severe impairment which significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 1520 (C). If the claimant's impairment is not severe, he is not disabled.

If the claimant has a severe impairment, the Commissioner evaluates whether the impairment meets or exceeds a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

If the Commissioner cannot make a decision based on the claimant's current work activity or on medical facts alone, and the claimant has a severe impairment, the Commissioner reviews whether the claimant can perform his past relevant work.

If the claimant can perform his past relevant work, he is not disabled.

If the claimant cannot perform his past relevant work, the burden of proof

shifts and the Commissioner must evaluate whether the claimant can perform other work in the national economy. If not, the Commissioner declares the claimant disabled. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.

When evaluating evidence of pain or other subjective complaints, the ALJ is never free to ignore the subjective testimony of the plaintiff, even if it is uncorroborated by objective medical evidence. Basinger v. Heckler, 725 F.2d 1166, 1169 (8th Cir. 1984). The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole. See e.g., Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990). In considering the subjective complaints, the ALJ is required to consider the factors set out by Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), which include:

> claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the objective medical evidence; (2) the subjective evidence of the duration, frequency, and intensity of plaintiff's pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the dosage, effectiveness, and side effects of any medication; and (6) the claimant's functional restrictions.

Id. at 1322. When an ALJ explicitly finds that the claimant's testimony is not credible and gives good reasons for the findings, the court will usually defer to the ALJ's finding. Casey v. Astrue, 503 F.3d 687, 696 (8th Cir. 2007). The ALJ retains the responsibility of developing a full and fair record in the non-adversarial

administrative proceeding.  <u>Hildebrand v. Barnhart</u>, 302 F.3d 836, 838 (8th Cir.

2002).

## THE ALJ'S FINDINGS

The ALJ issued his decision that Goodridge was not disabled on April 22,

2010.  In reaching this decision, the ALJ followed the five-step sequential

evaluation process, noting at step one that Goodridge had not engaged in

substantial gainful activity during the period from her amended alleged onset date

of November 21, 2007 through her date last insured of December 31, 2008.

Proceeding to step two, the ALJ found that Goodridge had severe impairments of

lumbar spine degenerative disk disease, fibromyalgia, migraines, epilepsy,

depression and anxiety.

At step three the ALJ concluded that Goodridge did not have an impairment

or a combination of impairments that met or exceeded one of the listed

impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  The ALJ noted that

Goodridge had a mild restriction in the activities of daily living, mild difficulties in

her social functioning, and marked or moderate difficulties with regard to

concentration, persistence or pace.  Also, the ALJ concluded that Goodridge had

no episodes of decompensation for extended duration.

The ALJ concluded that Goodridge had a residual functional capacity (RFC)

to perform a limited range of light work and could occasionally lift and/or carry 20 pounds and could frequently lift and/or carry 10 pounds.  Also, the ALJ concluded that she could stand and/or walk for six hours of an 8-hour work day, and sit for six hours of an 8-hour workday.  Furthermore, the ALJ concluded that she could occasionally climb ramps and stairs; and balance, stoop, kneel, crouch and crawl occasionally as well.  The RFC detailed that she could never climb ladders, ropes and scaffolds and she must avoid exposure to dangerous moving machinery and unprotected heights.  Additionally, she experienced a mild to moderate level of fatigue and discomfort affecting her ability to work in a competitive environment.

The ALJ found that Goodridge's medically determinable ailments could reasonably be expected to cause some of her alleged symptoms.  However, he found that her statements concerning the intensity, persistence and limiting effects of her symptoms were not credible to the extent that they are inconsistent with the RFC.

The ALJ gave great weight to the State agency medical consultants because he found their opinions were well supported by medically acceptable clinical and laboratory findings, and were consistent with the record when viewed in its entirety.  The ALJ considered the RFC completed by Dr. Myers, Goodridge's treating physician, but gave it little weight because the ALJ found it not to be

substantiated by the clinical findings and believed it was inconsistent with the other evidence of record.

The ALJ gave little weight to the statements of Goodridge's husband and daughter. The ALJ found that the family members were not disinterested parties, their testimony was inconsistent with the preponderance of the opinions and observations made by doctors in this case, and they were not medically trained so the accuracy of their statements is questionable.

At step four of the sequential evaluation process, the ALJ found that Goodridge is unable to perform any past relevant work. The demands of Goodridge's past relevant work, as a child monitor, exceed the RFC that the ALJ gave in his findings. The vocational expert opined that a hypothetical individual with Goodridge's RFC would be unable to perform Goodridge's past relevant work. Therefore, the ALJ found Goodridge unable to perform past relevant work.

At step five of the sequential evaluation process, the ALJ considered Goodridge's age, education, work experience, and RFC, and concluded that Goodridge's transferable work skills enabled her to work in jobs existing in significant numbers in the national economy. The ALJ made this determination after asking a vocational expert whether there were occupations that could be performed by an individual having the same age, education, past relevant work

experience, and the residual functional capacity that Goodridge possesses.

## DISCUSSION

### The ALJ's Failure to Consider bilateral sensory neuropathy

Goodridge contends that the ALJ failed to consider her bilateral sensory neuropathy in combination with her severe impairments of lumbar spine degenerative disk disease and fibromyalgia.

At step two of the sequential evaluation process, an ALJ determines the medical severity of a claimant's impairments. See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Goodridge bears the burden of showing that her impairments or combination of impairments is severe as defined by the Act. See Medhaug v. Astrue, 578 F.3d 805, 813 (8th Cir. 2009). See also Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001)(the claimant has "the burden of showing a severe impairment that significantly limited her physical or mental ability to perform basic work activities"). Furthermore, the ALJ is not obliged to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability. Gregg v. Barnhart, 354 F.3d 710, 713 (8th Cir. 2003).

Goodridge claims that the ALJ failed to provide any discussion for why he considered the bilateral sensory neuropathy to be non-severe. But the ALJ was not

obliged to determine the bilateral sensory neuropathy as a basis for disability because it was not offered in the application for benefits nor offered at the hearing.

On the Disability Report, Form SSA-3368, provided by Goodridge on November 7, 2007, she listed the following conditions that limited her work: "chronic back pain, fibromyalgia, deg disk disease, migraines, and epilepsy." On an Appeal Disability Report filed March 26, 2009, Goodridge was asked if there were any new physical or mental limitations since her last disability report and she answered in the affirmative stating "[a]nxiety attacks every day now and depression is worse." Moreover, Goodridge's treating physicians, Dr. Myers, and Dr. Parks, each opined as to her limitations, and neither brought up any limitations regarding the bilateral sensory neuropathy.

At the hearing, the ALJ stated, "[n]ow your claim for disability is based on what we're looking at your back pain, fibromyalgia, degenerative disk disease, what else am I looking at?" Goodridge responded, "[t]he wide spread body pains, the back pain, migraines....confusion, mental fog." Goodridge was later questioned by her lawyer, who asked about the back pain, the migraines, the anxiety, and the mental fog or confusion, but did not ask her about her issues regarding her bilateral sensory neuropathy.

Because Goodridge did not raise bilateral sensory neuropathy or make a threshold showing that the bilateral sensory neuropathy would more than minimally impact her ability to perform basic work activities, failure to consider it does not require reversal.

Residual Function Capacity

Goodridge next contends that in determining the Residual Function Capacity the ALJ erred by failing to properly consider the opinion of Dr. David Myers, Goodridge's primary care physician, and that the decision of the Appeal Council fails to properly consider the opinion of Dr. Parks. Dr. Park's opinion was dated March 2010, but specifically stated that it referred to her condition before December 31, 2008.

The Residual Functional Capacity (RFC) is what the claimant can still do despite her physical and mental limitations. 20 C.F.R. pt. 404. 154(a). Although the ALJ is not limited to considering only medical evidence in determining a claimant's residual functional capacity, the ALJ is "required to consider at least some supporting evidence from a professional," because a claimant's residual functional capacity is a medical question. Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).

The ALJ must defer to a treating physician's opinions about the nature and

severity of a claimant's impairments, "including symptoms, diagnosis, and prognosis, what an applicant is capable of doing despite the impairment, and the resulting restrictions." Ellis v. Barnhard, 392 F.3d 988, 995 (8th Cir. 2005); See also 20 C.F.R. pt. 404 (a) (2). A treating physician's opinion will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record. Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998). The ALJ must give good reasons for his or her assessment of the treating physician's opinion. 20 C.F.R. § 404.1527(d) (2).

Here, the first treating physician, Dr. David Myers, completed a Physical Residual Functional Capacity Assessment Form on November 29, 2006. This assessment was before the ALJ and it claimed that Goodridge could sit for 1 hour, stand for 1 hour, walk for 1 hour and work for 1 hour total in an 8-hour workday, and that she could occasionally lift and/or carry 10 pounds. This opinion further claimed that Goodridge is "totally disabled." The ALJ gave little weight to this opinion because he found it was not substantiated by the clinical findings, was not consistent with other evidence in the record, and was made a year or more before the amended onset date.

Dr. Park's opinion regarding Goodridge's RFC was dated before the ALJ

hearing, but apparently was not presented to  Where new evidence is presented to the Appeals council which was not presented to the ALJ, and the Appeals Council affirms the ALJ's decision, the proper procedure for the district court is not to remand to the commissioner for consideration of the evidence in the first instance by the ALJ; rather, the court should review the ALJ's decision and determine how the ALJ would have considered the newly submitted evidence.  20 C.F.R. § 404.970 (b). <u>See also</u> <u>Riley v. Shalala</u>, 18 F.3d 619, 622 (8th Cir. 1994). It was, however, before the Appeal Council, so it is part of the record.

Dr. Park's opinion is consistent with that of Dr. Myers and with the objective medical evidence.  Each opinion by Goodridge's treating physicians states that Goodridge cannot sit, stand, or walk for more than one hour in an 8-hour workday.  When Dr. Parks opinion is considered in conjunction with Dr. Meyer's opinion, their opinions are consistent with one another.  Although the medical evidence does not provide exact clinical findings showing the source of all of her pain, the many doctors she saw do not dispute that her pain exists.

Goodridge cites <u>Dewey v. Astrue</u>, 509 F.3d 447, 449 (8th Cir. 2007), and I find it to be similar to the case at bar.  In <u>Dewey</u>, the ALJ gave great weight to the RFC submitted by a lay person over the opinion of Dewey's treating physician who indicated that Dewey could not perform the light work recommended by the lay

person.  The Eighth Circuit concluded that the error was not harmless and that the

ALJ might not have inevitably reached the same result and remanded for rehearing.

As in <u>Dewey</u>, the ALJ here mistakenly gave great weight to the RFC

determination of a lay person not qualified under 20 C.F.R. § 404.1616 (b), who he

mistakenly characterized as a state agency medical consultant.  Additionally, he

improperly gave little weight to the treating physicians' opinions.  Substantial

evidence as a whole does not support the ALJ's decision and the matter must be

remanded to review the opinion of medical professionals and other objective

evidence.

## **CONCLUSION**

I reverse and remand pursuant to sentence four of 42 U.S.C. § 405(g) for

further proceedings consistent with this order.  <u>See</u> <u>Scott ex rel. Scott v. Astrue</u>,

529 F.3d 818, 822 (8th Cir. 2008) ("[W]e have held that a remand is appropriate

where the ALJ's factual findings, considered in light of the record as a whole, are

insufficient to permit this Court to conclude that substantial evidence supports the

Commissioner's decision.")

Because I conclude that the decision must be reversed on this basis, I have

not determined the effect of the ALJ's admitted failure to conduct the detailed

assessment of mental function as set out in paragraph B of the adult mental

disorders listings.  The Commissioner will have the opportunity to correct this error on remand.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is reversed and the case is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Memorandum and Order.

A separate judgment in accordance with this Memorandum and Order is entered this same date.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE


Dated this 25th day of January, 2012.